SOUTHLAND MOBILE HOME CORPORATION
et al *v.* David WEBSTER and wife

77-267                                    563 S.W. 2d 430

Opinion delivered March 20, 1978
(In Banc)

*Cecil B. Nance, Jr.,* of *Nance, Nance, Fleming & Wood,* and *Jake Brick,* of *Brick & Wallin,* for appellants.

*Thomas G. Montgomery,* for appellees.

GEORGE ROSE SMITH, Justice. In 1973 one of the appellants, Southland, sold a mobile home to the appellees, the unpaid balance of the purchase price to be paid in monthly installments.. The transaction was financed by the other appellant, Westinghouse Credit Corporation. According to the proof offered by both sides, the interest rate was slightly more than 10% per annum and was therefore usurious. After the purchasers had made 39 of the 72 monthly

payments they brought this suit to cancel their remaining obligation. The chancellor granted that relief. For reversal the appellants argue that the usurious charge was the result of a good faith mistake on their part. This argument presents a mixed question of law and fact.

The combined contract of sale and security agreement was dated June 26, 1973. It recited $3,916.35 as the balance to be financed and $1,328.85 as the finance charge. The total of $5,245.20 was to be paid in 72 monthly installments of $72.85 each. The interest rate was recited as 10.00%.

A pivotal point of dispute is whether the first monthly installment was due in 30 days (on July 26) or in 45 days (on August 10). The interest charge is usurious either way, but the excess is substantially greater if the first payment was due on the earlier date. We find the preponderance of the evidence to be clearly contrary to the chancellor's conclusion that the later date was what the parties intended.

The written contract's adoption of the earlier date is absolutely free from ambiguity. The contract is dated June 26. We copy the only pertinent language in the contract, with the blanks filled in or not filled in as we have shown:

> Buyer promises and agrees to pay the Total of Payments as follows: 72 equal successive monthly installments of $ 72.85 each on the _____ day of each month commencing* _____, 19___ and each month thereafter, or payable otherwise as follows:_____
>
> *If no date is inserted in blank, the first installment is payable one month from the date of contract.

Therefore, since the blank following the asterisk was not filled in, the first monthly payment was due on July 26, 1973.

Mrs. Webster, who handled the negotiations for herself and her husband, testified that she was told that the first payment would be due in the following month and that she was not told that it would be due in 45 days. Whoever handled the sale for Southland did not testify. Consequently, on the basis

of what happened between the parties on the day of the sale, it is undisputed that the intended date was July 26.

The appellants' argument to the contrary is based largely on their own unilateral actions. Southland, in calculating the finance charge and the amount of the monthly payments, had acquired and was using what is referred to as a Wang computer. In the use of this machine the operator would insert a printed form supplied by Westinghouse, the finance company. The operator would then feed into the machine the necessary data, such as the purchase price, the down payment, the charge for insurance, and the number of payments. The computer would then calculate the finance charge and the amount of the monthly payment and would type all the figures in the appropriate blank spaces.

The later 45-day payment date (August 10) comes into the picture because, even though the contract as filled in specified the earlier date, the computer was programmed to use the 45-day interval in every case. When two copies of the signed contract were received by Westinghouse at its office in Memphis, a coupon book showing the date of the monthly payments was prepared and sent to the purchasers. The Westinghouse employee who handled the transaction in question testified that, even though the contract was filled in to indicate a 30-day interval, she used the 45-day interval in preparing the coupon book because she knew that Southland used a Wang computer that was set to make its calculations on a 45-day basis. The proof indicates that the Websters, upon receiving the coupon book, actually used the 10th of each month as the due date.

The parties' intentions are to be determined as of the time the contract was made. *Walden* v. *Fallis,* 171 Ark. 11, 283 S.W. 2d 17, 45 A.L.R. 1396 (1926). That is also the date as of which the determination of usury is to be made. *Brown* v. *Central Ark. Production Credit Assn.,* 256 Ark. 804, 510 S.W. 2d 571 (1974). On that date the Websters signed a contract, prepared by the seller, specifying the 26th of each month as the payment date. No 45-day interval for the first payment was mentioned. Thus the clear preponderance of the evidence establishes the earlier date as the correct one.

The appellants argue, nevertheless, that the fault lay not with them but with the Wang computer. Preliminarily, we should say that it was stipulated that if the author of the Thorndike Encyclopedia of Banking and Financial Tables were called as a witness by the purchasers, he would testify that the contract was usurious by $21.34 if the July 26 date was used and by $5.25 if the August 10 date was used. It was also stipulated that if a certain bookkeeper were called as a witness by the defendants, she would testify that the contract was usurious by 19 cents if the August 10 date was used (and presumably by a greater amount if the July 26 date was used). Both witnesses used a daily interest rate in making their calculations. Of course, there are other ways of computing interest. See, for example, *Skelton Motor Co.* v. *Brown,* 231 Ark. 801, 332 S.W. 2d 607 (1960).

Marvin Poole, the owner of Southland, testified that he had been selling mobile homes since 1955. Before 1973 he had calculated monthly payments by means of a chart supplied by Westinghouse. That chart, however, gave the figures only for full months; so Poole made no charge for extra days. He decided to use a Wang computer, because it could make the necessary calculations for intervening days.

After acquiring the Wang computer, Poole had it make two sample computations, one with a 30-day initial interval and the other with a 45-day initial interval. Poole submitted the computations to a law firm for its opinion as to whether the computations were usurious. Both computations involved 96 monthly payments. As we understand the law firm's response, the 30-day computation, using a monthly payment of $131.13, fell short of 10% interest by a total of 14 cents over the life of the loan, and the 45-day computation, using a monthly payment of $131.67, fell short by 40 cents. Hence the firm approved the machine. We infer that the Wang computer was designed to arrive at a monthly payment that would be on the safe side to the nearest possible penny. In other words, the margin of error for a 96-month contract would be only 96 cents. Thus the 19-cent error found by the bookkeeper is not quite so demonstrably insignificant when it is borne in mind that on a 72-month contract the Wang computer was apparently designed to come within 72 cents of the

top lawful limit. Working within such close tolerances might be said to involve a calculated risk. (No doubt, of course, the computer was made to be used principally in states where an excessive interest charge does not invalidate the contract, as it does in Arkansas.)

The appellants, in insisting that they simply made a good faith mathematical error, cite cases such as *Sammons-Pennington Co.* v. *Norton,* 241 Ark. 341, 408 S.W. 2d 487 (1966), and *Cox* v. *Darragh Co.,* 227 Ark. 399, 299 S.W. 2d 193 (1957). In both of those particular cases, however, the initial calculation was attempted by a person who was not skilled in the computation of interest. We found that an honest mistake had been made in a good faith effort to charge only lawful interest. By contrast, we have not been as ready to overlook a mathematical error when responsibility for the calculation of interest had been assumed by a finance company. *Ford Motor Credit Co.* v. *Catalani,* 238 Ark. 561, 383 S.W. 2d 99, 11 A.L.R. 3d 1494 (1964). See also our finding of usury in *Cagle* v. *Boyle Mortgage Co.,* 261 Ark. 437, 549 S.W. 2d 474 (1977), where the excessive charges appeared upon computerized monthly statements.

We have often said, in upholding contracts assailed as usurious, that for a charge to constitute usury the lender must have intended to take more than the maximum rate of interest. *Brown* v. *Central Ark. Production Credit Assn., supra.* That statement, needless to say, cannot be taken literally in every situation. A lender can no more purge a loan of usury by saying that he did not intend to charge more than 10% interest than a borrower can contaminate his debt by saying that he meant to pay more than 10%. Our decisions have never implied that usury does not exist unless the parties, upon concluding their agreement, have shaken hands and congratulated each other upon having arrived at a contract calling for only 12% interest.

In the case at bar Southland's owner had been selling mobile homes for nearly 20 years. Westinghouse is a finance company that participated in the transaction from the outset by furnishing its forms, by paying Southland for its commercial paper, and by preparing the purchasers' coupon book. In

the circumstances Westinghouse was not a stranger to the transaction. See *Hare v. General Contract Purchase Corp.*, 220 Ark. 601, 249 S.W. 2d 973 (1952). Here there was a mistake, but as we said in *Holland v. C. T. Doan Buick Co.*, 228 Ark. 340, 307 S.W. 2d 538 (1957), "it was not a mistake made by erroneous figuring; it was not a matter of declaring one sum due when actually another amount was intended. The amount was arrived at because the wrong formula was used." We are firmly of the view that in this case the excessive charges, admittedly usurious, cannot be condoned on the theory that a good faith error was made by persons who should in equity be freed from responsibility for the consequences of their own action.

Affirmed.

FOGLEMAN, J., not participating.

BYRD and HOLT, JJ., concur.

HARRIS, C.J., and HICKMAN, J., dissent.

CARLETON HARRIS, Chief Justice, dissenting. I cannot agree with the result reached by the majority in this case. The majority affirm the chancellor, but hold that he erred in a finding that I consider to be pertinent in the litigation.

I do not accept the view that the first monthly payment was due to be paid 30 days after the June 26th date, rather than 45 dayd later. While it is true that the space for the commencement date was left blank in the printed contract (which would normally indicate that the first installment was due one month later), a coupon book, denoting the time for the payments, was sent to the Websters reflecting that the first payment was due 45 days later.[1] Furthermore, the computer was set to make its calculations on a 45-day basis and unless this constituted the general practice of the company, certainly the computer would not have been set for that period of time. In fact, the testimony of Mrs. Webster makes clear that

---

[1] A coupon book is sent to borrowers showing the date for payments, and the proper coupon is sent in with each payment to the company.

this payment was not made until 45 days after the execution of the contract:

"Q. Well, did you get a coupon book?

A. Yes. I did.

Q. Did you make your first payment from the coupon book?

A. Yes, sir.

Q. Okay, And would it have been around August the 10th?

A. Yes, sir. I believe so."

Thereafter, the payments were made on the 10th of each month. Accordingly, I think it is entirely clear that the chancellor's finding that the first payment was due 45 days from the signing of the contract was entirely correct; let it be remembered that the contract was executed on June 26th and Mrs. Webster herself said that the payment was sent in "around August the 10th." Therefore, I am firmly convinced that in calculating the interest, the 45 day interval for the first payment was the proper time element involved.

To me, the facts mentioned have a distinct bearing on another finding by the chancellor, viz, that there was no intent to charge in excess of 10% annual interest. In support of this finding is the fact that the company had just commenced, approximately a month before the contract in question was entered into, the use of the Wang computer. Marvin Poole, the owner of Southland, certainly took steps to ascertain that the calculations of this machine complied with the Arkansas usury law by preparing two sample computations (one with a 30 day interval and the other with a 45 day initial interval, involving 96 monthly payments) and submitting the computations to a reputable Arkansas law firm for its opinion, and thereafter, as stated by the majority, the firm approved the machine.

In *Sammons-Pennington Co.* v. *Norton*, 241 Ark. 341, 408 S.W. 2d 487, we reversed the chancellor's finding that a cer-

tain contract was usurious. The opinion reflects that an earlier contract had been entered into, but Norton advised the company that the payments exceeded the sum of $100 per week and he did not desire to pay more than that amount, including interest. The company then prepared a new contract and note to be used in lieu of the first, and the opinion then recites the following facts:

"George W. Sammons, President of Sammons-Pennington Company, and who resides in Memphis, testified that he knew that the legal rate of interest in Arkansas was 10% simple interest, but he did not know how to figure the amount under the new contract; accordingly, he called the Walter Heller Company to ascertain the correct amount to be charged as interest. The finance company, using 'Lake's Monthly Installment and Interest Tables,' gave him the figure of $3,-182.64 for interest, which was added to the principal sum of $15,943.05."

It developed on trial that the amount of interest called for under the latter contract was usurious and the contract was cancelled by the chancery court. We reversed, stating:

"Actually, it would seem that we have two lines of cases, the line of demarcation between usurious and non-usurious contracts being rather slight. It appears that, in determining whether a usurious charge has been made, *all attendant circumstances must be taken into consideration*. [My emphasis.] When this is done, we think it is plain that the overcharge in the instant litigation was the result of an error, made in good faith, rather than being based on an intent to violate the usury law."

The court further commented that "it seems rather ridiculous that any concern would risk cancellation of a principal debt of nearly $16,000 (not counting interest), in order to receive 'approximately $57 to $60' excess interest." Likewise, in *Davidson* v. *Commercial Credit Equipment Corporation*, 255 Ark. 127, 499 S.W. 2d 68, we found that the maximum overcharge would amount to five cents per month or $3.00 over the five-year term in which the indebtedness was to be retired. Commercial Credit, in computing the finance charge,

used a chart prepared by Financial Publishing Company of Boston, Massachusetts, and the opinion reflects that slight variations in results could be reached by use of other methods, and we again commented that "it would be ludicrous to think one would risk $20,000 in an effort to collect $3.00 or $4.00 more." That opinion also points out, "the use of usury will not be presumed, or imputed to the parties, and *will not be inferred if the opposite conclusion can be fairly and reasonably reached.*" (My emphasis.) Several cases are cited in support of this statement.

I am certainly in accord with enforcing the constitutional prohibition against usury and have written several opinions myself where we have found the transaction to be usurious, but the penalty of cancelling the entire indebtedness is so great that I feel that the statement in *Davidson*, heretofore quoted, that usury should not be inferred if the opposite conclusion can be fairly and reasonably reached, should be given close consideration. Here, as stated, I am convinced that the first payment was due 45 days later. Taking the computation of appellees' expert that an excessive charge on the August 10th date would be $5.25 over a six-year period, we have an excessive interest charge averaging approximately 87 1/2 cents per year. Even if we take the July 26th date, with excess total interest of $21.34 (which the majority say is the proper finding and with which I very much disagree), we still have an excess average interest charge of only approximately $3.50 per yaar. Other evidence offered reflected 19 cents overcharge for the six-year period.

Be that as it may, I am aware that any amount over 10% is an improper charge, but the cases cited (and there are numerous others) denote that the matter of intent has a great effect upon whether a transaction is held to be usurious. Even in the field of criminal law, the penalty for unintentional crimes is much less than for intentional crimes, but here the Court majority is subjecting appellant to the same penalty that a "loan shark," who set out to charge 40% interest, would receive.

Earlier I quoted from *Sammons-Pennington* to the effect that in determining whether a usurious charge has been made *all attendant circumstances must be taken into consideration.*

Here, we have a company using a new machine, with which it lacked experience or familiarity. The company obtained an opinion as a matter of trying to comply with the constitutional provision in issue; the amount of interest exceeding 10% is so minimal that one would have to be an utter and comple simpleton to jeopardize a contract involving several thousand dollars by intentionally collecting such an amount of interest. It is little wonder that the trial court found that there was no intent to violate the usury laws.

I would reverse.